IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAQUITA BLOCKSON,<br><br>Plaintiff,<br><br>v.<br><br>MORAVIAN UNIVERSITY,<br><br>Defendant. | CIVIL ACTION NO. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND JURY DEMAND**

Plaintiff Laquita Blockson, by and through her attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint"):

**PRELIMINARY STATEMENT**

1. This is an action for an award of damages, attorneys' fees and other relief on behalf of Plaintiff Laquita Blockson ("Dr. Blockson"), a former employee of Moravian Univesrity ("Defendant" or "Moravian"). Dr. Blockson has been harmed by Defendant's discrimination and harassment based on her sex and race, and by Defendant's retaliation against her for complaining about discrimination and harassment, culminating in her termination on August 7, 2023.

2. This action is filed pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq. ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA").

**JURISDICTIONAL STATEMENT**

3. This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

6. All conditions precedent to the institution of this suit have been fulfilled. On October 13, 2023, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC"). On October 17, 2024, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice. With respect to the PHRA claims alleged herein, it has been more than one year since Dr. Blockson dual-filed her Charge as a Complaint with the PHRC.

**VENUE**

7. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

8. This action properly lies in the Eatern District of Pennsylvania because the claims and significant activities associated with the claims arose in this judicial district, and Plaintiff was employed by Defendant in this judicial district.

## PARTIES

9. Plaintiff Laquita Blockson is an adult female individual who is a citizen and resident of Bethleham, Pennsylvania and the United States of America.

10. Defendant Moravian University is a private liberal arts university offering undergraduate and graduate degrees, located at 1200 Main Street, Bethlehem, Pennsylvania 18018, where Dr. Blockson was employed.

11. At all relevant times, Defendant Moravian University is and has been an employer employing more than five hundred (500) employees.

12. Defendant Moravian University does significant business within the Commonwealth of Pennsylvania.

13. At all relevant times, employees of Moravian University acted as agents and servants for Moravian.

14. At all relevant times, employees of Moravian University were acting within the scope of their authority and in the course of employment under the direct control of Moravian.

15. At all times material hereto, Moravian University acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Moravian and in furtherance of Moravian's business.

16. At all times relevant hereto, Defendant is and has been an "employer" and/or "person" within the meaning of the laws at issue in this matter, and is accordingly subject to the provisions of said laws.

17. At all relevant times hereto, Plaintiff Laquita Blockson was an "employee" within the meaning of the laws at issue in this matter, and is accordingly entitled to the protections of said laws.

18. This Honorable Court has jurisdiction over Defendant.

**FACTS**

19. On or about July 13, 2022, Moravian University extended an offer of employment to Dr. Blockson for the position of Dean for the School of Business and Economics ("SOBE") and Professor of Management.

20. Dr. Blockson accepted the offer and began her employment with Moravian on August 1, 2022.

21. While employed by Moravian, Dr. Blockson excelled in her position, performing her duties in an competent and professional manner.

22. Despite her dedication to the job, and consistent performance, Dr. Blockson was discriminated against and harassed on the basis of her sex and race, and was retaliated against for her complaints about discrimination and harassment.

23. Dr. Blockson, who was one of five Deans/Associate Deans under the Academic Affairs umbrella during her time at Moravian but was the only non-White Dean/Associate Dean, experienced a culture at Moravian where her views, approach and authority were not respected by her almost exclusively White and Asian subordinates, and where her superiors consistently sided with Dr. Blockson's subordinates over her and refused to offer her appropriate support in her role.

24. In stark contrast to Dr. Blockson's experience at Moravian, the other four White Deans did not have to endure the same challenges with colleagues and faculty faced by Dr. Blockson as an African American female.

25. After Dr. Blockson complained about discrimination and harassment she was swiftly retaliated against and terminated before she even was able to begin her second year.

26. The treatment Dr. Blockson endured is consistent with a pattern at Moravian that appears to foster and perpetuate discrimination, harassment and retaliation.

27. For example, Moravian's former Diversity, Equity and Inclusion Director, Dr. Nicholas Creary, has alleged that he was terminated after moving across the country to join Moravian and that his termination was motivated by, among other things, his vocal support of DEI issues and simply doing his job as DEI Director.

28. Likewise, Daisy Purdy, an Indigenous woman who was hired as a diversity officer at roughly the same time as Dr. Creary, was also abruptly fired after making a land acknowledgment statement at Moravian's intercultural graduation ceremony.

29. Dr. Creary has filed a Charge with the Equal Employment Opportunity Commission, and Moravian was also recently sued by another professor, Dr. Tabor, who alleges she was forced to change jobs after complaining that a colleague used the racial slur "ni**er" to refer to a student.

30. This pattern serves as important background for Dr. Blockson's experience of discrimination and harassment on the basis of her sex and race and demonstrates the hostile work environment that existed at Moravian and retaliation that Moravian's employees faced for complaining about discrimination and harassment perpetuated at Moravian.

31. The Moravian University SOBE was formed as a result of a 2021 transition to University status.

32. This allowed dean-level faculty to lead newly formed colleges and schools within the university structure.

33. Dr. Blockson was particularly experienced and qualified for the role, as, prior to joining Moravian, Dr. Blockson was the Founding Faculty Director of Social Innovation and an Associate Professor of Business Management at Agnes Scott College in Decatur, Georgia.

34. Despite her excellent qualifications, however, Dr. Blockson's tenure at Moravian was doomed from the start.

35. As an African American female, Dr. Blockson was never able to gain the respect or loyalty of the Moravian faculty that was afforded to her non-African American colleagues.

36. It became increasingly clear to Dr. Blockson that had she been White or male, the faculty would have buckled down, followed orders, asked what they had to do, and followed through on their orders and the work that needed to be completed.

37. Instead, the Moravian faculty – which consisted of all White and Asian individuals, and one individual of Middle Eastern descent – constantly questioned Dr. Blockson, talked poorly about her and her approach, and refused to follow her directives.

38. Clearly, the faculty had no confidence in her based on her race and sex and made their distaste and mistrust of Dr. Blockson well known.

39. Dr. Blockson attempted to encourage the faculty to follow the chain of command and work together, but the faculty refused to do so, and Carol Traupman-Carr, Moravian University Provost, failed to support Dr. Blockson and her efforts.

40. Dr. Blockson attempted to raise these issues with Dr. Traupman-Carr and Associate Provost, Lesley Brown.

41. In further evidence of discrimination and harassment, both Dr. Traupman-Carr and Dr. Brown sided with the non-African American faculty, claiming that they had to focus on the "working relationship" and expressing alleged concerns of any potential faculty resignations.

42. The non-African American faculty was simply not ready or willing to be led by an African American female, and their conduct and behavior blatantly demonstrated as such.

43. Notably, another Dean, a White female, specifically informed Dr. Blockson that she had not experienced any of the difficulties, hostility or issues that Dr. Blockson had experienced, and expressed her opinion that the difficulties, hostility, and issues that Dr. Blockson continuously experienced were due to Dr. Blockson's race.

44. Dr. Blockson had been hired for her experience, qualifications, and innovative approach, which SOBE needed.

45. Dr. Blockson raised questions and sought to make changes, including changes to the handbook, and tried to address outstanding issues.

46. She was told that it would all take time.

47. However, she was never given that time and was never supported in her efforts.

48. Not only was there was strong resistance to all of Dr. Blockson's proposed improvements and efforts, she was constantly faced with hostility and negative comments from others.

49. Among other things, the faculty would repeatedly claim that Dr. Blockson was "not to be trusted" and that no one should believe what she was saying.

50. Dr. Blockson was also chastised for using certain terms, such as the word "directives," despite that, as a business school, the terms used by Dr. Blockson would typically be part of a faculty's everyday vernacular,

51. When Dr. Blockson brought these issues to Dr. Brown, she was told to "just wait and see what happens."

52. During a meeting with Dr. Traupma-Carr in January 2023, Dr. Traupman-Carr admitted that Dr. Blockson had been placed in a precarious position, but turned the blame on Dr. Blockson rather than her entirely non-African American faculty, telling Dr. Blockson it was her responsibility to foster "positive working relationships."

53. Dr. Blockson also attempted to institute approaches that were used and had been applied successfully at other universities, but these attempts were also rejected on grounds that they were "not collaborative."

54. Dr. Blockson attempted to engage in collaborative conversations, including coaching and training, but the University was resistant to all attempts.

55. Notably, if a White or male employee had used these approaches, the faculty would not question such efforts.

56. The faculty's dissatisfaction and frustrations with the University were taken out on Dr. Blockson, and particularly so because Dr. Blockson was an outsider that did not look like them.

57. University issues and bungles were improperly blamed on Dr. Blockson, and it became glaringly obvious that Dr. Blockson was being set up for failure.

58. In or about early April 2023, the University gave Dr. Blockson three (3) options: step down and be a member of the faculty, go on a PIP, or resign.

59. Dr. Blockson was directed to take a week off of work and consider her decision. Dr. Blockson specifically asked if she was being suspended, but the University assured her that she was not, and this was just meant as an opportunity for Dr. Blockson to "reflect" on the events that had transpired over the past 6 months.

60. Dr. Blockson informed the University that she would accept the PIP.

61. As instructed, Dr. Blockson took the week off in early April 2023.

62. On or about April 17, 2023, Dr. Blockson had a meeting with the Provost, Dr. Traupman-Carr, and Dr. Brown, Associate Provost.

63. At that meeting, Dr. Blockson informed them that she felt that they were handcuffing her.

64. Dr. Blockson also expressed her concerns that she was being discriminated against and harassed based on her race and sex.

65. She shared literature regarding women of color in the workplace and raised the issue of implicit bias.

66. Dr. Blockson requested that they address the issue and support her.

67. Although Dr. Traupman-Carr claimed that she would support Dr. Blockson, Dr. Traupman-Carr again protected the faculty and thus supported their discrimination and harassment of Dr. Blockson, stating that the University "needed positive working relationships" and that the faculty had to be comfortable working with Dr. Blockson.

68. Thereafter, although the University did hold an implicit bias workshop, it was a lackluster effort in name only: it was held over the summer and was thus not mandatory, so only 5 out of the 15 faculty members within the School of Business and Economics actually attended.

69. Dr. Blockson was still put on the PIP beginning May 1st.

70. Notably, it was only a 2 month PIP, despite that, for administration or employees at a higher executive level, such plans would be more likely to last for at least 6 months, to give the employee sufficient time to prove her performance.

71. Unsurprisingly, and notwithstanding any length of time for the PIP, the University swiftly demonstrated that it had no intention to allow Dr. Blockson to recover from the PIP or prove her performance.

72. On Friday, August 4, 2023, Dr. Blockson was provided with the School of Business and Economics faculty's evaluation of her performance.

73. On Monday, August 7, 2023, Dr. Blockson was invited to a meeting with Dr. Brown and Human Resources Director Dior Mariano and told prior to the meeting that it was to review the results of the faculty's evaluation she had been provided on August 4th.

74. At the meeting that afternoon, Dr. Blockson was not provided any opportunity to dispute the findings of the evaluation, offer any evidence to contradict the faculty's statement, or to present her side of things at all.

75. Instead, while Dr. Brown indicated that Dr. Blockson had "made great strides" in her performance, she also indicated concern about risk of allowing a "toxic environment" to continue into the new academic year.

76. Dr. Blockson understood this comment to be not only an attempt to again cast blame on Dr. Blockson for her faculty's toxicity, but also a veiled reference to Dr. Blockson's complaints of discrimination and harassment.

77. Dr. Blockson was not afforded an opportunity to step down to become a faculty member, but was instead informed that she was being terminated.

78. The lack of any legitimate justification for Moravian University's termination of Dr. Blockson and its actions indicates that the real reason for Moravian's treatment of Dr. Blockson and her termination was motivated by discrimination on the basis of her sex and race and retaliation for her complaints of discrimination and harassment.

79. Given her treatment during her employment with Moravian University, Dr. Blockson maintains that Moravian University discriminated against her on the basis of her sex and race and retaliated against her for her complaints about discrimination and harassment.

80. Defendant discriminated against and harassed Dr. Blockson because of her sex and race – including, among other things, by refusing to provide her with any support while supporting her non-African American colleagues, siding with Dr. Blockson's non-African American colleagues when Dr. Blockson raised concerns about discrimination and harassment, rejecting Dr. Blockson's ideas and approaches, and placing Dr. Blockson on an unjustified PIP – and retaliated against Dr. Blockson for complaining of the discrimination and harassment in violation of Title VII, Section 1981 and the PHRA.

81. Defendant willfully violated Title VII, Section 1981 and the PHRA, as Defendant knew that its actions violated the statutes and/or acted with reckless disregard as to whether its actions violated Title VII, Section 1981 and the PHRA.

82. As a result of the discrimination, harassment, retaliation and other wrongful conduct perpetrated against Dr. Blockson by Moravian University, Dr. Blockson has suffered significant financial losses including, among other things, loss of employment and loss of wages.

83. Dr. Blockson has suffered significant financial loss, harm to her reputation in the community and other harm and damages as a direct and proximate result of the actions and inactions of the Defendant.

84. Dr. Blockson has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and/or inactions of Defendant.

85. Defendant and its agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Dr. Blockson to suffer emotional distress.

86. As a result of the Defendant's conduct described herein, Dr. Blockson has incurred a significant obligation for attorneys' fees and costs of bringing this action.

## COUNT I
### Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), et seq.

87. Plaintiff Laquita Blockson repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

88. Based on the foregoing, Defendant Moravian University engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

89. In discriminating against and harassing Dr. Blockson because of her sex and race, and in retaliating against Dr. Blockson for her complaints of discrimination and harassment, Defendant violated Title VII.

90. Defendant's violations were intentional and willful.

91. Defendant's violations warrant the imposition of punitive damages.

92. As the direct and proximate result of the aforesaid unlawful employment practices engaged in by Defendant Moravian University, Plaintiff Laquita Blockson has sustained a loss of earnings and earning potential, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

93. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## COUNT II
### Civil Rights Act of 1866, 42 U.S.C. § 1981

94. Plaintiff Laquita Blockson repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

95. Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981").

96. In discriminating against and harassing Dr. Blockson on the basis of her race, and in retaliating against Dr. Blockson for her complaints about discrimination and harassment, Defendant violated Section 1981.

97. Said violations were intentional and willful.

98. Said violations warrant the imposition of punitive damages.

99. As a direct and proximate result of the unlawful employment practices engaged in by Defendant, Plaintiff has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

100. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## COUNT III
**Pennsylvania Human Relations Act, 43 P.S. § 951, et seq.**

101. Plaintiff Laquita Blockson repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

102. Based on the foregoing, Defendant Moravian University has engaged in unlawful employment practices in violation of the Pennsylvania Human Relations Act.

103. In discriminating against and harassing Dr. Blockson because of her sex and race, and in retaliating against Dr. Blockson for her complaints of discrimination and harassment, Defendant violated the PHRA.

104. As the direct and proximate result of Defendant's violations of the Pennsylvania Human Relations Act, Plaintiff Laquita Blockson has sustained loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

105. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## PRAYER FOR RELIEF

106. Plaintiff Laquita Blockson repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Laquita Blockson respectfully requests that this Court enter judgment in her favor and against Defendant Moravian University and Order:

a. Appropriate equitable relief including reinstatement or front pay;

b. Defendant to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination, harassment and retaliation;

c. Defendant to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of its unlawful conduct;

d. Defendant to pay Plaintiff punitive damages;

e. Defendant to pay Plaintiff liquidated damages;

f. Defendant to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g. Defendant to pay Plaintiff's costs of bringing this action and her reasonable attorneys' fees;

h. Plaintiff be granted any and all other remedies available pursuant to Title VII, Section 1981 and the PHRA; and

i. Such other and further relief as is deemed just and proper.

## JURY DEMAND

Plaintiff Laquita Blockson hereby demands trial by jury as to all issues so triable.

By: */s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 John F. Kennedy Boulevard
Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff
Laquita Blockson*

Dated: January 14, 2025